CASE No. 1105.

BOUKNIGHT v. BROWN.

1. Exceptions to a judgment are not in proper form, where they only refer back to points taken in exceptions to the referee's report.
2. If a referee, to whom are referred all the issues, fails to report his facts found and conclusions of law separately, the proper remedy is to move that the report be remanded for correction.

3. Under the first section of the act of 1865 (13 *Stat.* 345), statements in a bill between two tenants in common are admissible in evidence against others not parties to such bill, to show that certain former proceedings, in part destroyed during the war, made disposition of the property here in dispute.

4. In an action brought by certain persons claiming, as devisees, under a will, which treated certain children named as illegitimate, no question was made before the referee, or Circuit judge, as to the fact of illegitimacy, and they so found. *Held,* that it was too late, in this court, to raise the point that the illegitimacy was not proven.

5. A testator devised one-fourth of his estate to his illegitimate children, a part to a legitimate son, and the residue to three friends, in "the confident hope," &c., that they would permit his illegitimate children to have the use of such property, the part to S., a daughter, to be conveyed to trustees for her use during her life, and after her death, in trust for such children as she may leave alive. If this expression of a wish to his three friends made such devise void, the residue was to pass to the three friends absolutely; and if efforts were made to impeach any part of his will, the property devised to the legitimate son was to vest absolutely in the three friends. Afterwards, there was filed, in the Court of Equity, a bill, which was lost during the war, but decretal and final orders, writ of partition, return of commissioners (one of whom was one of the three friends), and other papers in the cause, were preserved, and they sufficiently indicated that the action was instituted to confirm certain arrangements between the several parties, made because of the desire on the part of the legitimate son to set aside the excessive provisions for the illegitimate children, with the probable consent of the three friends of testator. By this arrangement, certain land, other than that devised to S. and her children, was vested in S. and her husband, and their heirs, they being ordered to pay sums of money to other parties to that cause. *Held,* that the children of S., afterwards born, could not, after the death of S., claim this land from S.'s vendees, as it was not that which was devised to them in remainder, nor was it impressed with the trusts and remainders charged upon the devise to them, but was a purchase by S. for valuable consideration.

6. *Held, further,* that the devise to the friends in the "confident hope," &c., was intended, by the testator, as a trust for the benefit of his illegitimate children, and was, therefore, void under the act of 1795. 5 *Stat.* 271.

7. And the devise to the children of S., if a valid limitation, was a contingent remainder, which must fall with the destruction of the precedent estate given to S. *Hull* v. *Hull,* 2 *Strobh. Eq.* 192, explained.

Before WALLACE, J., Richland, July, 1879.

Action by Caleb Bouknight and Sarah W. Poole against John P. Brown.

The exceptions to the referee's report, the Circuit decree, and the opinion of this court constitute a sufficient statement of the case.

The exceptions were as follows:

The plaintiffs except to the report of Francis W. Fickling, referee herein—

1. In that the said report does not contain a statement of the facts found and the conclusions of law separately.

2. In that the referee admitted in evidence the record of the suit in equity, Nathaniel Bynum v. John Gray Bynum.

3. In that said report finds that the proceedings by William Bynum were instituted for the purpose of setting aside the will of Drury Bynum, on account of the third clause thereof, and that the will was set aside by a court of competent jurisdiction.

4. In this, that the report finds:

a. That Drury Bynum, by conditional devise to his executors, defeated his gift for the benefit of the issue of his illegitimate daughter.

b. And that this gift was a contingent remainder, and fell with the precedent particular estate in Sarah upon which it is found to have depended.

c. That the gift to Sarah was void.

d. That the Statute of Limitation is a bar to the action.

e. That the legal estate remains in the trustees.

5. In this that the report orders and adjudges the complaint to be dismissed, and the costs and disbursements to be paid by plaintiffs.


The Circuit decree was as follows:

As regards the plaintiffs' first exception to the report of the referee, it is proper to say that the report was filed in the early part of the year 1878, and sets out facts and matters of law with sufficient distinctness to convey clearly what the findings of fact and law by the referee are.

The plaintiffs' second exception is also overruled. Section 13, *Gen. Stat.* 346.

The third exception relates to the finding by the referee that the will of Drury Bynum was set aside.

There is no doubt that the will of Drury Bynum was a valid instrument as to all persons except his legitimate son, William Bynum. It was competent for him to avoid it. *Hull* v. *Hull,* 2 *Strobh. Eq.* 192; *Breithaupt* v. *Bauskett,* 1 *Rich. Eq.* 465. How was this to be done? He is put to his election, either to take under the will, or to avoid the will. When his election is made, his right accrues and vests. Ch. Harper says, in *Breithaupt* v. *Bauskett,* "I will not say but that, by possibility, if the will had contained no provision for the wife, or only an illusory one, there might be ground to conclude that she had elected, during her life-time, to take against the will, and that her representatives came, not for the purpose of avoiding it, but to enforce rights already vested by her election;" of course, any positive *act* of election would be stronger evidence of election than the possible effect of the provisions of the will upon the mind of the wife. Then, if Wm. Bynum elected to avoid the will, his right to avoid it accrued, and, if contested, would be enforced by the court. The bringing a bill to set aside the will would be one mode of indicating an election; but not the only one. It is clearly deducible from the evidence that he did elect to avoid the will. It appears from that part of the record of the case of *Wm. Bynum et al.* v. *James Bynum and others,* which we have, that by the consent and acquiescence of all the parties in interest, who were living at the time, an arrangement was made by which the estate of Drury Bynum was divided without reference to the provisions of his will. This agreement amounted to an election, by Wm. Bynum, to avoid the will, and a recognition by those whose rights, under the will, were adverse to his, of his right to avoid it, or of its actual avoidance as to all the parties who were *sui juris.* And this suit of *William Bynum et al.* v. *James Bynum et al.* could have been brought for no other purpose than to bind those who were not *sui juris,* and not *in esse,* by the election of William Bynum to avoid the will. The court, in that case, after instituting inquiry according to its customary methods, pronounces a decree which necessarily implies an avoidance of the will, this avoidance made up by the acts of the parties and the decree of the court. All the parties before the court are concluded by that decree. Are the plaintiffs

in this action—the representatives of R. C. Shiver and Sarah W. Evans—concluded also? R. C. Shiver and Sarah W. were not *in esse* at the time of the decree. They were the children of Sarah Shiver, unborn at the time of the decree, to whom an estate was limited over after the death of Sarah Shiver, by the will. They were contingent remaindermen. If the will was in operation at the time they were born, the estate opened and their interest became vested. But the will, by acts of parties and decree of the court, was absolutely set aside and avoided, and the rights of contingent remaindermen under it barred. In support of this view, it will not be necessary to do more than to refer to the opinion of Ch. Dunkin, concurred in by Harper, O'Neall and Wardlaw, in *Van Lew* v. *Parr*, in which this point is elaborately discussed. In that opinion, on page 346 of 2 *Rich. Eq.*, the following language is used: "Unless this court had authority to dispose of the fee-simple of the estate for the payment of debts, it is quite clear that it could not be reached. If it had the authority, not having the contingent remaindermen before the court, the validity of the title, executed by the officer of the court, is not open to objection. But if the court can make a good title for the payment of debts, if it has authority in any case to dispose of the fee, not having those in remainder before it, the exercise of that authority in cases of *partition*, or for the change of property, becomes a question of *discretion*, and not of jurisdiction." In this, a case of *partition*, the court has exercised its discretion, and has expressly disposed of the fee, and the remaindermen are barred.

According to the conclusions of this decree, the complainants have no right of action, and the remaining questions raised by the decree need not be discussed. The complaint is dismissed, with costs for defendant.

*Messrs. W. S. Monteith* and *Youmans*, Attorney-General, for appellant.

*Mr. J. D. Pope*, contra.

October 20th, 1881. The opinion of the court was delivered by

McGOWAN, A. J.   This was an action for the possession of a tract of land lying in Richland county, latterly known as the "Shiver Place," and ten thousand dollars damages, besides rents and profits to the amount of fifteen thousand dollars.

Drury Bynum, owning a large estate, consisting of several tracts of land, slaves, &c., died about January, 1837, leaving no widow and only one legitimate son, William Bynum.   He left a will, by which he disposed of his property as follows:

*By the first clause* he gave to his four children, *Nathaniel, Sarah, James* and *John Gray,* "whom he had begotten by Sally Bryson," one-fourth part of the clear value of his estate.

*By the second clause* he gave to his son, William [who was legitimate], his mill tract of land; confirmed certain gifts previously made to him, to be in lieu and bar of all claim said William might have against him on any account whatever.

*By the third clause he disposed as follows:* "I give, devise and bequeath the whole of the rest and residue of my estate, real and personal, to my friends, *John Scott, William Weston* and *Wade Hampton, Sr.,* for life, and the survivor of them, his heirs, executors, administrators or assigns, *in fee-simple, absolutely and forever.*   It is my wish that my said friends shall hold the property thus devised to them *free from all trust whatever.* Nevertheless, I have devised and bequeathed the same to them, in the confident expectation and hope that they will permit my children by Sally Bryson, to wit: Nathaniel, Sarah, James and Gray, for whom I am under a sacred obligation to provide, to have the use of the whole of the estate, real and personal, absolutely and forever, in the manner following: that is to say, that my friends will permit the said James and Gray to have, &c., * * *   *The balance of my swamp and bluff lands I wish to be divided equally among my children, Nathaniel and Sarah.*   And it is my earnest hope and expectation that my friends, John Scott, William Weston and Wade Hampton, Sr., will permit the balance of my lands to be equally divided between Nathaniel and Sarah, my children by Sally Bryson.   * * *   And it is my hope and confident expectation that my said friends will carry into effect these, my wishes, by conveyances proper to that end, after my death, *and, especially, in relation to my daughter,*

*Sarah, aforesaid,* that they would *convey to some person in trust for her, during her life, all that portion of said rest and residue of my estate, real and personal, which I have devised above, that she should enjoy for her sole and separate use, free from the debts, contracts and control of any husband she may marry, and after her death, in trust for such children as she may leave alive, and the descendants of any* that may be dead at such period, they taking among them their parents' share; but if" (here providing for the event of Sarah dying without issue.)

*By the fourth clause* he declared that if the foregoing provision was void, he gave the whole residuum of his estate to John Scott, William Weston and Wade Hampton, Sr., for life, and to the survivor forever, *without any expression of his wishes, hopes or expectations.*

*By the fifth clause* he directed that if any attempt should be made " to impair his will or any part thereof," the second clause of his will should be void, and the property therein given to his son William should also go to John Scott, William Weston and Wade Hampton, Sr., their heirs and assigns forever. And these same gentlemen were nominated executors of the will.

The will was proved, but the gentlemen named as executors never qualified or accepted the devises given or trusts imposed, and they are all now dead.

It appears that soon after the death of his father, the legitimate son, William Bynum, filed a bill in equity against all the illegitimate children entitled *William Bynum et al.* v. *James Bynum and others,* "for settlement and partition." The pleadings in the cause have been lost or destroyed, and the precise scope of the bill cannot be known, except so far as it may be gathered from certain orders in the case, which, in some way, have escaped the fate of the general record and are in existence. By these orders, copies of which can be found in the case, it appears that the children, legitimate and illegitimate, all of whom were of age except James and Gray, entered into an agreement to disregard the will entirely, and have a new division of the whole estate upon certain settled terms. Certain property was allotted to *William, the legitimate son,* and the remainder to the four illegitimate children. To confirm and ratify this

L

agreement, division and assignment appears to have been the object of the bill. September 25th, 1837, Chancellor Harper granted an order of reference to inquire "whether it would be to the interest of the minors, James Bynum and John Gray Bynum, to ratify and confirm the said agreement and deed of assignment set forth in complainants' said *Exhibit D.* and *E.,* together with the partition contained in *Exhibit A.* and *B.,* purporting to have been made in conformity to said agreement and deed of assignment," &c.

The commissioner reported favorably, and on November 7th, 1837, Chancellor DeSaussure confirmed the report, ordered that the property contained in *Exhibit A.* and *B.,* be vested in William Bynum, his heirs and assigns forever; "and further ordered that the remaining estate, real and personal, *be vested in the said Nathaniel Bynum, Sarah Shiver, James Bynum and John Gray Bynum,* upon their payment to the said William Bynum, *the said bond of six thousand and sixty-three dollars,* that the said estate, real and personal, herein vested in them, do stand pledged for the payment thereof according to the condition of the said bond, and that they also pay the said Sarah Bryson the said annual annuity of $350," &c. He further ordered that "a writ of partition should issue to make partition of the remaining estate, real and personal, *equally between Nathaniel Bynum,* Sarah Shiver, James Bynum and John Gray Bynum. All of which is in pursuance of the agreement of the parties, and to carry the same into effect," &c.

The commissioner reported that the property assigned as aforesaid to the four illegitimate children, consisted of 110 slaves, horses, mules, &c., and 3,133 acres of land, valued at the aggregate price of $63,774.50. The commissioner allotted *all the lands to the two children* who were then of age, *Nathaniel and Sarah,* and recommended that they should pay to the other two children half the value of the lands in money, viz., $11,356.25. This return was confirmed by Chancellor David Johnson, January 12th, 1838, who ordered that the lands allotted in said return to *Nathaniel Bynum and Sarah Shiver and William Shiver, her husband,* be vested in them and their heirs as tenants in common forever, &c. It was further ordered

that the two plantations on Towe's creek, now in the respective possession and cultivation of Nathaniel Bynum and William Shiver, being a part of the foregoing premises, &c., * "*be and stand pledged for the payment of the said two sums of* $5,678.12 *to the said James Bynum and John Gray Bynum, with interest,*" &c.

It does not appear when or how Mrs. Shiver and her brother Nathaniel made division of their joint estate in these lands, but it does appear that they paid their brother for their interest in the same.

Some time prior to April, 1842, Sarah and her husband, William Shiver, sold and conveyed the land in dispute, since known as the "Shiver Place," to Richard Singleton, trustee, for the price of $14,450. Singleton paid the purchase-money, took conveyance of Shiver and wife, went into possession, and he, or those claiming under him, have been in possession ever since—a period of nearly forty years.

In 1844, Nathaniel Bynum, who had become the guardian of his infant brother, *John Gray*, filed a bill connected with his guardianship, which, among other things, contained the following recital : "That his father, Drury Bynum, departed this life January 15th, 1837, leaving a large estate, both real and personal, and also leaving his last will and testament, disposing of the same among his five children—that is to say, your orator, Nathaniel Bynum, *William Bynum* and Sarah Bynum, adults, and James Bynum and John Bynum, minors, which last will and testament, however, *was by agreement of all parties interested therein set aside and abandoned*, and proceedings for partition of the said estate were instituted in the Court of Equity for Richland district, in pursuance of said agreement on September —, 1837, in which proceeding the said William Bynum and others were the complainants, and James Bynum and others were the defendants," &c.

Sarah Shiver died January 9th, 1850, leaving two children surviving her, Robert C. Shiver and Sarah W. Shiver, both born after the proceedings in partition. Robert C. died, leaving Caleb Bouknight his sole executor and devisee, and Sarah W. intermarried with one Poole, and they are the plaintiffs who

brought this action March 5th, 1875, to recover the tract of land described.   The answer denies every allegation in the complaint, and pleads the Statute of Limitations.

F. W. Fickling, Esq., was appointed special referee "to hear and determine all the issues of law and of fact."   He decided all the issues of law for the defendant, and recommended that the complaint be dismissed.   Judge Wallace confirmed the report, and the plaintiffs appeal to this court upon the following exceptions :

1. To his Honor's ruling in the first exception made to the referee's report.

2. To his Honor's ruling on the second exception to the referee's report.

3. To his Honor's ruling as to the third, fourth and fifth exceptions to the referee's report.

4. Because all the exceptions to the referee's report should have been sustained.

These exceptions are not in the best form.   They do not state the matter objected to, but refer to other exceptions to the report of the referee, which tends to confusion and makes it necessary to go back through the record to find out what points those exceptions made.   "Exceptions should point out the particulars in which the errors complained of consist." *

As we understand it, the first exception intended to make the point that the referee's report did "not contain a statement of the facts found and conclusions of law separately."   Section 296 of the code declares that "they [referees] must state the facts found and the conclusions of law separately."   The object of this requirement is to promote clearness and prevent confusion. If the Circuit judge had considered it necessary, he might have required the report put in form, but he did not.   The remedy in such case is to move that the proceedings be referred back for correction.   *Waite's An. Code* 498.   The report does not, in the usual way, state the facts and the law under different heads, but we concur with the judge that they are stated "separately" and with unusual clearness and ability.   See *Joplin* v. *Carrier*, 11 *S. C.* 329 ; *State, ex rel. Cathcart* v. *Columbia*, 12 *Id.* 393.

---

* See rule No. 5 of the Supreme Court, as amended since the filing of this opinion.—REPORTER.

*The second exception* objects to the judge's ruling in that "the record of the suit in equity, *Nathaniel Bynum* v. *John Gray Bynum*, was admitted in evidence." The statements of this bill were admissible under the first section of the act of 1865, "to provide a mode by which to perpetuate testimony," &c., (13 *Stat.* 345,) which, among other things, declares that "statements in the record of any suit in any of the courts, produced from the proper place of custody, although such statements be in cases not between the parties to the suit in which the evidence is offered, or those under whom they claim, shall be admissible for *the consideration of the court or jury*," &c. The statement was merely in corroboration of what may be fairly gathered from the fragments preserved of the case of *William Bynum et al.* v. *James Bynum et al.*

*The other exceptions make the question of title.* No exception was taken below to the report finding that Nathaniel Bynum, Sarah Bynum, James Bynum and John Bynum were the illegitimate children of Drury Bynum "by Sally Bryson," but it has been seriously argued here, that there is no proof of such illegitimacy. That is the most important fact of the case. The will itself, in its terms and in its whole structure, affords at least *prima facie* evidence of the fact, which has never been denied. It was taken to be shown before the referee and the Circuit judge. The referee reported it as a fact, and the Circuit judge concurred with him without objection. At that time the matter could have been conclusively settled in a moment. It is now too late to raise the question for the first time. We are judicially satisfied of the fact.

The plaintiffs claim as the children of Sarah Shiver, remaindermen under the third clause of Drury Bynum's will, which, as they insist, is legal and binding in all its parts. There is no other limitation in the will except that claimed to exist in that clause. Even assuming the plaintiffs' view of the case, there are difficulties in the way of their recovery. The action is to recover the possession of *a particular tract of land;* and before that can be done, it is necessary, not only that they should show legal title, but also that their title *connects with and covers the particular land sued for, the "locus in quo."*

Now, all the land that the testator, in the third clause of his will, "hoped" would be conveyed in trust to Sarah with limitation over, was "the balance of the swamp and bluff lands," to be equally divided between Nathaniel and Sarah. It has not been shown that the Shiver place sued for is any part of the "swamp or bluff lands." On the contrary, the referee reports "it was asserted by the defendant, and not denied by the plaintiffs, but as I understood admitted, that the lands in dispute in this action are not the lands assigned to Sarah in testator's will," &c. This would seem to be conclusive against the plaintiffs, without going into the question of title.

But they urge that, although the Shiver tract is no part of the lands indicated in the will, with limitation over to them, there was *a proceeding in equity* to divide these lands among the parties, and in doing so the lands got mixed, and the Shiver place was assigned to Sarah in lieu of "swamp or bluff lands," and that thereupon the trusts claimed in the third clause *attached upon the land received in lieu of those given by that clause.* To sustain this view it is necessary that the partition should have *been under and by authority of that clause, and in subordination to it.* That is not supported by the proceedings in partition. We look in vain for an order to sell and re-invest, or to make an exchange upon the same trusts. It cannot fairly be claimed that these proceedings were intended to carry out the provisions of the third clause of the will.

There are other facts in the record which show that the Shiver tract is not *in the place of* any lands intended for Sarah under the will. The lands assigned in the partition to Sarah, including the Shiver place, *were in part* of her interest in the fourth of the estate given by the first clause of the will without limitation; *also in part* for her proportion of the bond of $6,063 *to William* in the division with him, and of the annuity of $300 to "Sally Bryson," *and still further in part* for $5,678.12, which she was to pay *to James and John* in the second partition between her and her brother; so that the evidence does not show that the Shiver place was assigned to Sarah *in lieu* of lands intended for her in the will. The exact contrary is true. The proceedings in equity were inconsistent with the

existence of the third clause and manifestly intended to super-
sede it. The referee says on this point: "It is, in fact, manifest,
that in the partition no regard was had to the will inasmuch as
the entire lands were allotted to Nathaniel and Sarah, including
the lands assigned James and John Gray in the will." The
plaintiffs, therefore, cannot receive aid from the partition pro-
ceedings to make out a case under the third clause of the will,
when those proceedings were inconsistent with that clause and
antagonistic to it. They cannot hold *under* that proceeding and
*against* it at the same time. So many elements entered as con-
sideration into that partition, under which the Shiver tract was
assigned to Sarah, that it cannot be affirmed with truth that said
land was *simply substituted* for that indicated in the will for her.
It was to a large, possibly to the whole, extent purchased for
valuable consideration by Sarah, and by the order of court
*assigned to her and her heirs forever.*

If there was no difficulty as to the identity of the land, how
would the matter stand? The defendant insists that the whole
third clause of the will, including the alleged limitation in it,
was illegal and void, and no rights growing out of it can be
recognized and enforced by the courts. The act of 1795 declares
void any gift or provision beyond one-fourth of a man's estate
in favor of a woman with whom he lives in adultery, or of his
illegitimate child or children, he having a wife or lawful chil-
dren of his own living. The gift is rendered void by the act
only to the extent of the excess. The testator had already
given one-fourth of his estate to his illegitimate children by the
first clause of his will, and, therefore, any interest intended to
be given to them by the *third clause* was in violation of the law
and void. It is true that the terms of that clause were to *John
Scott, William Weston and Wade Hampton, Sr.*, but coupled with
the "confident hope and expectation" that they would permit
his children "by Sally Bryson" to enjoy it in the manner
indicated. Considering the words of the act, which are "by
deed of gift, legacy, devise, *or by any other ways or means what-
ever*," we cannot doubt that it was the intention of the testator to
create a trust for the benefit of his illegitimate children, not-
withstanding his disclaimer of such intention. It is true that

the provision was good against all the world but the legitimate son, William, and good against him until he elected to have it declared void, which was his exclusive personal privilege. *Breithaupt* v. *Bauskett,* 1 *Rich. Eq.* 466 ; *Ford* v. *McElray, Id.* 474 ; *Hull* v. *Hull,* 2 *Strobh. Eq.* 174 ; *Taylor* v. *McRa,* 3 *Rich. Eq.* 96. *Did William Bynum elect to exercise this exclusive privilege and have the third clause declared void ?* He certainly did, soon after his father's death, file a bill in the Court of Equity in regard to the estate. Unfortunately the record of that case is lost, but some orders made in it have been preserved, from which we have a general idea of the proceeding. It appears that all the children, legitimate and illegitimate, *agreed to divide the property in a manner entirely different from the division made by the will.* That this agreement was ratified and confirmed by the court, and under its orders partition made to carry out the judgment of confirmation. In the fragments we have, it does not appear expressly that William sought to have the third clause declared void, but can it be doubted that he did so? He could have had the third clause set aside at a word. It was his interest to have it done and the new division adopted, by which he got largely more than was given to him by the will. The new arrangement could not be confirmed without the destruction of the third clause as being inconsistent with it. The agreement was confirmed by the court, which, doubtless, acted on the assumption that the third clause was avoided, and William received property under it, which itself was an election against the third clause. Under these circumstances, can it be doubted that he elected to set aside the third clause ? Neither his conduct nor that of the court is intelligible upon any other assumption, but all is harmonious and consistent with the existence of that fact. It is said that his interest was against such election, as the effect would be to give the whole estate to Scott, Weston and Hampton, except the fourth given by the first clause. That is true, but we have no doubt these gentlemen allowed the children to make their own arrangements. Instead of setting up title for themselves, they generously and honorably facilitated a judicious family settlement. We think it improbable that William would have filed a bill for purposes inconsistent with

the third clause without making the claim to set it aside, which was absolutely necessary to sustain those very proceedings. It is adjudged that William Bynum elected to vacate the third clause of his father's will; that it was declared void and the property of the testator divided among his children according to an agreement made by them and ratified by the court. That was more than a "consent decree." It was not less a judgment of the court because it was in accordance with the wishes of the parties. The court took care of the rights of the minors, and ordered references for information, &c., &c. The successive orders of different chancellors were in the terms usual in judgments. "*It is ordered and decreed*," &c.

But it is ingeniously argued that, though the third clause was made void as to Sarah, it was good in so far as it made provision for *her children,* and that as to unborn children neither the parties nor the court could bar their rights. It is true that the act does not, in express terms, reach to the interest of *children* of illegitimates, but it would seem a strange result if the devise, dead as to the *first* generation, should *revive* as to *the second.* That would certainly, to some extent, defeat the purpose of the act. In the case of *Bradley* v. *Lowry, Spears Eq.* 1, it was held that the act is remedial and should be construed so as to suppress the mischief contemplated by it. In that case a father had given property to *the husband* of his natural daughter, and it was held to be a benefit conferred on the daughter within the meaning of the act, because the evident design was to confer a benefit on her *through her husband* in evasion of the statute. The case of *Hull* v. *Hull,* 2 *Strobh. Eq.* 192, was relied on to sustain the proposition that any interest given to *the children* of Sarah did not fall within the inhibition of the statute. That case was different from this. There, the gift was to *Zulina,* the illegitimate daughter, *for life,* with limitation over to her issue. The life-estate to *Zulina was not declared void,* for it was a part of the fourth of the estate, which was legal, but in estimating *the value* of her interest the question arose whether she was to be charged with the value of an absolute estate or only of a life-estate. It was held that she should be charged only with the value of the life-estate,

and from that it is sought to draw the inference that in all cases of gifts to the *children* of illegitimates, the destruction of the estate of the first taker leaves untouched the limitation over. In these broad and sweeping terms we do not think the proposition can be maintained. In the case of Hull, the judgment of the court was pronounced in very guarded terms: " That interests of the children of a bastard daughter, who take as purchasers (under the will of their grandfather), distinctly from their mother, *and not through her or in connection with her,* shall not be regarded as a gift to her " within the inhibition of the act of 1795. In the case before us the devise to the mother *was declared void,* and if the third clause gave a good limitation over to the unborn children, it was a contingent remainder, in which the interests of the tenant for life and the remaindermen were not " *unconnected,*" but were parts of *the same estate.* A remainder is what is left of an entire estate after the preceding part of *the same estate* has been disposed of. But if the interest of the remaindermen was so " unconnected " with the freehold in the mother as to place it beyond the reach of the avoiding act, the Court of Equity had the power to partition the property, and in doing so to bar the remaindermen.

" When property is devised to tenants for life, with contingent remainders to persons not *in esse,* the Court of Equity has the power, for the purpose of partition, on the application of the tenants for life before the coming into existence of the remaindermen, to order a sale of the fee and thereby bar the remaindermen." *Van Lew* v. *Parr,* 2 *Rich. Eq.* 322 ; *Bofil* v. *Fisher,* 3 *Rich. Eq.* 1. It will be observed that as soon as the devise was made void by the election of William, the will itself *expressly revoked* the third clause and substituted therefor the *fourth clause,* which had no limitation. Besides, by the ordinary rules of construction, the limitation over could not be enforced after the life-estate had been declared void. If the future interest is so limited that it can take effect as a remainder, it cannot be an executory limitation. 2 *Minor Inst.* 369 ; *Fearne Rem.* 385. A contingent remainder may be destroyed at common law by fine or recovery, by merger of the particular estate, or by any *displacement* thereof, and this is the great and essential

·difference between a contingent remainder and executory devise. "It is agreed that when a preceding *freehold* has *once vested,* no ·subsequent accident will make a contingent remainder inure as an executory devise, its character as a remainder having been then finally established." *Fearne Rem.* 525–6; 2 *Washb. Real Prop.* 348.

This will at the death of the testator was good, and Sarah's life-estate *vested under it,* but when William elected to invalidate it the life-estate of Sarah was destroyed, and that destruction included the contingent interest of the unborn children. As tersely stated by the referee, "the gift to the issue of the illegitimate daughter was contingent, and fell with the precedent particular estate, upon which it depended." The gift to Sarah being void, the gift to her unborn issue who survived her was also void.

This being an action at law, the costs, of course, follow the result.

The judgment of this court is that the judgment of the Circuit Court be affirmed.

SIMPSON, C. J., and McIVER, A. J., concurred.